## CHARLOTTE PETERSON v. LAWRENCE TRUELSON AND OTHERS.

83 N. W. (2d) 236.

May 17, 1957—No. 36,955.

*Larson, Loevinger, Lindquist, Freeman & Fraser, Donald M. Fraser,* and *Gerald E. Magnuson,* for appellant.

*Frank X. Cronan* and *John E. Castor,* for respondent Minneapolis Street Railway Company.

*Meagher, Geer, Markham & Anderson, William T. Egan,* and *O. C. Adamson II,* for respondent Pioneer Holding Company.

KNUTSON, JUSTICE.

This is an action for damages by a passenger of a taxicab owned by defendant Pioneer Holding Company for injuries sustained when an automobile driven by defendant Lawrence Truelson ran into the rear of the taxicab, forcing it into the rear of a streetcar owned by defendant Minneapolis Street Railway Company. The jury returned

a verdict for plaintiff against Truelson and the street railway company. The court thereafter granted the motion of the street railway company for judgment notwithstanding the verdict, and plaintiff appeals from such order.

The accident occurred about 11 p. m. on January 16, 1954, at or near the intersection of Glenwood Avenue and Second Avenue North in the city of Minneapolis. Glenwood Avenue runs generally in an east and west direction. Second Avenue runs generally in a north and south direction and intersects Glenwood Avenue nearly at right angles.

The weather on the night involved was cold, the temperature being 20 degrees below zero. It was a dark, cloudy night with a heavy overcast, but visibility for driving was good. The intersection involved was well lighted by an overhead light on the southeast corner of the intersection. Traffic at the intersection is controlled by stop-and-go semaphore lights.

All three vehicles involved were traveling in a westerly direction on Glenwood Avenue. There was no other traffic of any kind on either street forming the intersection at the time involved. The streetcar was of the large, old type, well lighted throughout. It had no stop lights on the rear.

As the streetcar approached the intersection, it came to a stop east of the intersection in obedience to a red light. The taxicab then was following the streetcar at a distance of about 20 feet. It, too, came to a stop to the rear of the streetcar. When the light turned green, the streetcar started slowly to proceed through the intersection and had almost passed through when it again slowed down and came to a gradual stop. The maximum speed of the streetcar testified to by any witness was from five to ten miles per hour. The taxicab likewise slowed down and came to a stop about eight or ten feet to the rear of the streetcar. While there is some evidence that the street was icy and slippery in spots, the taxicab had no difficulty in coming to a stop. The motorman of the streetcar testified that he had released the brakes and had started moving forward (but the jury probably could find that both the streetcar and

taxicab remained stopped for a period variously estimated by the witnesses to be from 2 to 20 seconds) when Truelson ran into the rear of the taxicab, driving it into the streetcar. Plaintiff, sitting in the rear seat of the taxicab, sustained rather serious injuries as the result of this impact.

Prior to the accident, Truelson had spent several hours in a tavern drinking beer and some whiskey. He stated that he had two or three bottles of beer and part of a half pint of whiskey which he had brought to the tavern with him, although he was not certain how much he drank. He admitted that he was "feeling good" at the time of the accident. A policeman, who appeared on the scene shortly after the accident and saw him when he was later taken to the city safety building, testified that in his opinion Truelson was intoxicated.

Truelson testified that he first saw the taxicab and streetcar when he was 40 feet east of the east side of the intersection and about 100 feet from the rear of the taxicab. Second Avenue North is 60 feet wide. Truelson stated that he was traveling at a speed of from 15 to 20 miles per hour and that he did not apply his brakes until he was 25 feet from the rear of the taxicab. In his pretrial deposition he stated several times that when he first saw the taxicab and streetcar they were standing still. At the trial he insisted that he did not know if they were standing still or moving. The taxicab was equipped with rear stop lights activated by pressure on the brake pedal, and these rear lights were on during at least part of the time that the streetcar and taxicab were coming to a stop. The taxicab also had a large light on the stop of its body, which was on, and it had other rear lights on. The streetcar was well lighted and could be seen easily from the rear.

At the time the streetcar started to cross the intersection, several of the witnesses observed a pedestrian on the sidewalk on the northwest corner of the intersection, running in a southwesterly direction and waving his arm. He was first seen by the motorman as he emerged between two cars parked on the north side of the street. He was then running in a southerly direction, and, as he approached

the most northerly rail, he turned toward the streetcar and ran toward it. The motorman testified that as the pedestrian came to the corner of the car he "ducked" to the right of the car and that was the last he saw of him. None of the witnesses, except the motorman, observed the pedestrian after he passed the parked cars. The motorman insisted that he simply stopped his car in order to avoid hitting the pedestrian. The gates of the streetcar were never opened prior to the collision, and the pedestrian did not board the car. What became of him no one knows.

After the trial, the jury returned a verdict based on special interrogatories in favor of plaintiff against defendants Truelson and Minneapolis Street Railway Company and in favor of Pioneer Holding Company. The trial court granted the motion of the street railway company for judgment notwithstanding the verdict against it. The appeal does not involve the verdict against Truelson, nor does it involve the verdict absolving Pioneer Holding Company from liability.

The only question involved in this appeal is whether the evidence presents a fact question for the jury's determination on the issues of negligence and proximate cause as to the street railway company.

Essentially, plaintiff's position is stated in her brief as follows:

"* * * the jury was justified in concluding (1) that the street car was stopped by its operator in order to permit the pedestrian to board the street car and (2) that an ordinarily prudent person would not stop a street car on the far side of an intersection for such purpose, because the operator of the street car should have foreseen that by stopping the street car in an improper and unexpected place as he did, at night with icy streets, vehicles to the rear of the street car and their occupants were exposed to harm which could result from a rear-end collision."

Plaintiff's case rests on the proposition that the motorman stopped the streetcar to permit the pedestrian to board the car at an unauthorized place. The motorman stated emphatically, and several times both on direct and cross-examination, that it was not his intention to pick up the pedestrian at that point but that he stopped

in order to avoid hitting him. On cross-examination, plaintiff's own counsel elicited the following testimony:

"Q. I think this is true, is it not, Mr. Miller, that it was your intention to pick up this person at the next stop?

"A. No, it was not; it was my intention to stop to avoid hitting him.

"Q. As I understand it, you thought he wanted to get on the street car, however, whatever your purpose of stopping was?

"A. It appeared that he wanted to, yes.

"Q. Was it your intention, then, to *pick him up at the next stop?*

"A. That was my intention, yes." (Italics supplied.)

On redirect examination, he testified:

"Q. Why did you stop?

"A. To avoid hitting a pedestrian."

There is no evidence to contradict this direct and unequivocal statement. While the streetcar came to a stop and remained in that position for a period of time variously estimated to be from 2 to 20 seconds, the gates of the streetcar were never opened so as to admit the pedestrian and the pedestrian never boarded the streetcar. To permit an inference that the purpose of stopping was to pick up this pedestrian, contrary to the positive testimony of the motorman and the action of the motorman prior to the collision, would, as the trial court said, be to permit an inference based entirely on conjecture. The only permissible inference here is that the motorman saw the pedestrian approaching him in a place of possible danger and that he gradually brought his car to a stop to avoid hitting him. It is true that there is some slight conflict in the evidence as to what the pedestrian was doing and as to exactly where he was when the streetcar began to slow down. However, none of the witnesses saw the pedestrian after he emerged into the street. Some of them saw him for only a few seconds and paid no particular attention to him.

This case is another illustration of the futility of trying to create a jury issue out of slight variations in the testimony of witnesses

as to elements of time and distance based on fleeting observations and estimates ranging from seconds in time to a few feet in distance. Plaintiff claims that the jury could find that the streetcar had been stopped only two or three seconds, whereas the trial court thought that the evidence established that the streetcar had been stopped for from eight to ten seconds. We fail to see that it would make much difference which view was taken. It is clear from the testimony of all the witnesses that the streetcar had come to a gradual stop and that no effort was made to permit the pedestrian to board the streetcar. It is also clear from the testimony that the only one who saw the pedestrian after he emerged from between the two parked cars thought that he was in a position of danger and that, if the car had not been stopped, it would in all probability have collided with the pedestrian.

■ A conflict in the testimony of witnesses does not create a jury question if, when the conflict is resolved in favor of the plaintiff, the evidence still does not permit an inference in her favor on the issue involved. As we said in Hanson v. Homeland Ins. Co. 232 Minn. 403, 405, 45 N. W. (2d) 637, 638, "Not every conflict in evidence gives birth to a jury question." The evidence in this case does not permit an inference that the motorman stopped his car for the purpose of permitting the pedestrian to board the car.

■ The jury may not be permitted to disregard all the positive, unimpeached evidence in the case and draw an inference contrary to all such evidence based on the mere supposition that possibly the motorman may have had in his mind an intention to stop the streetcar to permit the pedestrian to board it. To permit the jury to do so is to allow it to draw an inference based entirely upon conjecture, supported by neither testimony nor circumstantial evidence.

■ In view of the fact that an inference that the motorman stopped to permit the pedestrian to board the car is not permissible under the evidence in this case, there is no basis for a finding of negligence against the streetcar. Nor does plaintiff suggest any. Plaintiff relies largely on Nees v. Minneapolis St. Ry. Co. 218 Minn. 532, 16 N. W. (2d) 758. The facts in that case are clearly distin-

guishable from those now before us. In that case, a truck was within 100 feet of a streetcar, which had come to a stop in obedience to a stop light, when the streetcar started across the intersection. About then, two pedestrians entered the street, apparently intending to board the car. When the truck was about 10 to 15 feet behind the streetcar, the car stopped suddenly without any warning in violation of a city ordinance, and the truck driver was unable to stop in order to avoid running into the streetcar. Much reliance is placed upon the following statement in our opinion (218 Minn. 538, 16 N. W. [2d] 762):

"* * * where a motorman suddenly stops a streetcar within an intersection without giving a signal or warning of any kind and without proper regard for traffic in the rear, a jury is clearly authorized to find that such act constitutes negligence unless the motorman can be absolved from a charge of negligence because acting in an emergency. The risk reasonably to be perceived defines the duty to be obeyed. Hence, here, if the motorman could reasonably have perceived that the sudden stopping of the streetcar *to accommodate the pedestrians* imperiled the safety of vehicles immediately in the rear, it was his duty either to continue on to the next regular stop, or, if he elected to stop within the intersection, to signal or otherwise warn such vehicles." (Italics supplied.)

Applied to the facts of this case, plaintiff cannot obtain much comfort from this language. Here, the streetcar did not stop to accommodate the pedestrian but, to the contrary, stopped to avoid hitting him. There was no sudden stop. All the witnesses, including plaintiff, testified that the streetcar and taxicab came to a slow, gradual stop. The taxicab, following the streetcar, did not run into it. To the contrary, the taxicab, which Truelson was following, did have warning lights on its rear, which should have warned Truelson of a probable stop, at least part of the way across the intersection. Truelson saw the streetcar and taxicab when he was 100 feet back of them. The evidence clearly showed that at that time both were stopped, since all the witnesses testified that the taxicab was part way through the intersection and the streetcar practically through

it when they were stopped. The intersection was 60 feet wide, and Truelson claims that he was 40 feet east of the east edge of the intersection and 100 feet back from the taxicab when he first saw the streetcar and cab. Taking his own testimony, which is the only evidence there is, that he was 100 feet back from the taxicab and 40 feet east of the intersection when he saw the cab and streetcar, it is apparent that, when Truelson was 100 feet back or 40 feet east of the east side of the intersection, both taxicab and streetcar were standing still. Both streetcar and taxicab were well lighted, and the intersection also was well lighted. Under these circumstances, even if the motorman had seen the approaching Truelson car (which he did not as he was watching the pedestrian), it is difficult to see how it could be held that he should reasonably have anticipated harm to Truelson or to the occupants of the taxicab by this gradual, normal stop. We have consistently followed the rule stated in Christianson v. Chicago, St. P. M. & O. Ry. Co. 67 Minn. 94, 97, 69 N. W. 640, 641:

"* * * If a person had no reasonable ground to anticipate that a particular act would or might result in any injury to anybody, then * * * the act would not be negligent at all; * * *."

In Despatch Oven Co. v. Rauenhorst, 229 Minn. 436, 447, 40 N. W. (2d) 73, 81, we state the rule as follows:

"* * * It is axiomatic that an act or omission is not negligent unless the actor has knowledge or notice that it involves danger to others. Duty to exercise care is dictated and measured by the exigencies of the occasion as they are or should be known to the actor; and if no harm should be anticipated as a consequence of the act there is no negligence."[1]

Under the evidence in this case it is difficult to see how any reasonable person could or should have anticipated that harm would befall those in the taxicab following the streetcar because of the failure of Truelson, traveling some distance behind the taxicab, to

[1]See, also, Rue v. Wendland, 226 Minn. 449, 33 N. W. (2d) 593; Thompson v. Peterson, 235 Minn. 142, 50 N. W. (2d) 53.

avoid running into the rear of the cab. We are of the opinion that the negligence of Truelson was the sole proximate cause of plaintiff's injuries and that the court correctly held that no negligence has been established as against the operator of the streetcar.

Affirmed.