GLORIA A. LAMBACH v. NORTHWESTERN REFINING
COMPANY, INC., AND ANOTHER.
GERALD E. FITZGERALD v. GLORIA A. LAMBACH AND
OTHERS.
VERNON SCHEID AND ANOTHER, APPELLANTS.

111 N. W. (2d) 345.

October 6, 1961—Nos. 38,116, 38,117.

*Merlyn C. Green* and *Bundlie, Kelley & Torrison,* for appellants.
*Thomas F. Burns,* for respondent Fitzgerald.
*Rischmiller, Wasche & Hedelson,* for respondent Lambach.

MAGNEY, COMMISSIONER.

On February 24, 1958, an accident took place on State Highway No. 36 in Ramsey County. Cars involved were an Oldsmobile, owned and operated by Richard Lambach; a Chevrolet station wagon, owned and operated by Gerald E. Fitzgerald; a Chevrolet car, owned and operated by Gustaf A. Erickson; and a tractor-trailer gasoline truck, leased by defendant Northwestern Refining Company and operated by its employee, defendant Vernon Scheid. Lambach sustained fatal injuries and Fitzgerald also was seriously injured. Action was brought by Gloria A. Lambach as trustee for the heirs of Richard Lambach and as administratrix of his estate against Northwestern Refining Company and Vernon Scheid. Another action was brought by Gerald E. Fitzgerald against Gloria A. Lambach as administratrix of the estate of Richard Lambach, deceased, Vernon Scheid, Northwestern Refining Company, and Gustaf A. Erickson. Summary judgment in this action was granted in favor of Erickson. The two cases were tried together. The jury brought in a verdict in each case against defendants Scheid and Northwestern Refining Company, and they appealed from the orders of the court denying their motions for judgment notwithstanding the verdict or a new trial.

State Highway No. 36, in Ramsey County, runs in a general east and west direction. It is 46 feet wide and at the place of the accident is divided into 4 lanes. Two yellow lines in its center divide the highway into eastbound and westbound halves. In each half the lanes are separated from each other by a broken white line.

On February 24, 1958, defendant Vernon Scheid was the operator of a gasoline truck and trailer leased by defendant Northwestern Refining Company. This gasoline transport unit was estimated to be about 40 feet in length and 7 feet in width. It had two rearview mirrors, one on each side of the cab. These provided a good view along the truck and the highway to the rear, but a "blind spot" of about 25 to 40 feet remained immediately to the rear of the truck that could not be seen in the mirrors by the driver.

At about 9:15 in the morning of February 24 Scheid was driving the gasoline truck westerly on Highway No. 36, intending to deliver a tank load of gasoline to a filling station near Anoka. He had a load of

5,875 gallons. As he approached the Soo Line overpass, a passenger car and a truck loaded with aluminum boats were ahead of him. All vehicles were traveling in the more northerly of the westbound lanes. The car overtook and passed the boat truck at about the overpass. The boat truck was then about 400 feet ahead of Scheid. It was traveling at about 20 to 25 miles per hour, while Scheid's speed was 35 miles per hour in a 50-mile zone. The distance between the vehicles was closing, and, when Scheid was about 150 feet to the rear of the boat truck, he started to pull out to the left to pass. West of the Soo Line overpass there was a slight downgrade for about 500 feet. Then followed an upgrade, with the highway curving to the right or northwesterly. Scheid turned on his turn signal about 100 feet before he started to cross over into the passing lane. He looked through the rearview mirrors before making the turn. He saw a 1958 Ford about 500 to 1,000 feet back of his truck, moving at about the same rate of speed. He saw no other car to his rear. Scheid started to cross over into the passing lane about 500 feet west of the Soo Line overpass and completed it in about 400 feet. He continued at about the same rate of speed. From the time his left front wheels crossed the line which separates the westbound lanes until he reached the place of the accident, he drove about 700 or 800 feet, based on tapeline measurements. In a preliminary deposition he had estimated this distance to be 200 to 250 feet. The unit was straightened out in the passing lane in about 300 to 400 feet, according to tapeline measurements. In a prior deposition he had estimated this distance to be 100 feet. He completed the turn about 50 feet behind the boat truck. The distance from the Soo Line overpass to the place of the accident is 1,300 feet. When the front wheels of the tractor were about in line with the back wheels of the trailer of the boat truck, the units overlapping about 3 feet and Scheid's truck traveling about 3 feet from the yellow line, Scheid heard a noise from the left rear of the trailer, which he described as follows:

"I heard a scraping sound and a bang.

\* \* \* \* \*

"\* \* \* They were right together."

He looked out of his left rearview mirror and saw dust and cars spin-

ning around on the highway. He then parked his truck about 300 feet ahead.

The cars Scheid saw through his rearview mirror were the Oldsmobile, whose owner and driver, Lambach, received injuries from which he later died; the Chevrolet station wagon, whose owner, Fitzgerald, was so seriously injured that he remembered nothing of the accident; and the Chevrolet passenger car, driven by Erickson, which had run into the Fitzgerald car after the collision. About the only thing Erickson contributed to the testimony was that he and Fitzgerald were both traveling in the more northerly eastbound lane; that the Lambach and Fitzgerald cars collided head on; and that Erickson ran into the Fitzgerald car. The Oldsmobile, coming from the east, and the Chevrolet station wagon had collided head on, the left front of each car being smashed. After the collision, the Lambach car faced north across the eastbound half of the highway, with the front of the car about the middle of the road. The Fitzgerald car was several feet farther east, in the eastbound half of the highway, facing east. The Erickson car was behind the Fitzgerald car, a few feet farther toward the south side of the highway. The debris lying in the northerly eastbound lane, most of it a foot or more south of the yellow lines, indicates where the collision took place. There was no debris lying in the northerly of the westbound lanes, which is a strong indication that no collision took place there.

Scheid had not seen the Lambach car prior to the collision. It may have been in the blind spot.

There were gouge marks in the passing lane, described by a witness as almost like a rabbit's foot—probably meaning rabbit track—one main one and two or three little ones. The main one was about 5 feet long and was lengthwise of the highway; it was in the westbound passing lane about 7 feet north of the yellow lines and about opposite the debris in the eastbound lane. Tarvia appeared underneath the right rear bumper of the Lambach car, slightly to the right. The trailer was painted red and the Lambach car bluish green. After the accident, there were red marks or smears on the chrome of the right rear taillight of the Lambach car; also, about the center of the top of the right rear door. There were bluish-green marks or smears on the

outer of the rear dual wheels on the left side of the trailer. There was no bluish-green paint on the apron of the trailer, but the dust was scraped off the apron down to the red paint above the lower edge of the apron, just above the dual wheels. There was a small dent on the apron just in front of the rear dual wheels; also one near the rear of the apron. There were tire marks on the right portion of the rear bumper of the Lambach car, and also on the right rear portion of the lid of the trunk, which had been pushed up and forward but not crushed. The rear set of dual wheels on the trailer, which were very near its rear end, were pushed back under the apron and were facing somewhat out. The front bumper of the Lambach car was lying on the pavement about a foot or so south of the yellow centerlines.

A detailed recital of the testimony produced at the trial seemed necessary in view of appellants' claim that the verdict of the jury is based on conjecture and speculation. They claim that only by resorting to guess, conjecture, and speculation may theories be suggested to support the verdicts and that no theory suggested has that support in the evidence requisite to a recovery. The theories advanced by the respective parties plaintiff will now be considered.

Plaintiff Lambach, in her brief, argues that "[t]he facts in evidence have definitely established that at the time of the crash defendant Scheid was in the act of changing lanes * * * and had not completed the lane change." She also states:

"This evidence forceably demonstrates that the Lambach vehicle was in the westbound passing lane, along side the defendant's vehicle before the crash. It further shows that the right rear of the Lambach vehicle was ahead of the rear duals of defendant's vehicle; that after the scraping of the right side of the Lambach car with the left side of the defendants' truck the right rear of the Lambach car was at or near the center of the passing lane at the time of the crash. This further demonstrates that defendants' vehicle could not have been straightened out in the passing lane when this crash occurred."

She argues that, because of the evidence of the fresh tar beneath the Lambach right rear bumper and, inferentially, the gouge in the tarvia, the Lambach car was occupying at least half of the passing lane at

the time of the crash. This gouge, as we have stated, was about 5 feet long, running lengthwise of the highway, and about 7 feet (three-fifths of 11½ feet) north of the yellow centerlines. She contends that because of these physical facts it is definitely established that, as Scheid was changing lanes, he forced and drove the front of the Lambach car across the centerlines and into the path of the Fitzgerald car.

The above is the Lambach theory of the case as set forth in her brief. No one saw the Lambach car and appellants' truck alongside each other prior to the Lambach-Fitzgerald collision. Plaintiff Lambach claims that the gouge in the tarvia was caused in some manner by a contact between the Lambach car and appellants' truck. This gouge, as has been stated, was lengthwise of the highway.

We will next consider plaintiff Fitzgerald's theory as to the cause of this accident. He contends that the evidence indisputably established how the collision occurred and that no guess or speculation is involved. He claims that appellants' truck was in the northerly of the two westbound lanes; that the Lambach car was in the southerly of the westbound lanes; and that they were proceeding side by side. He states that if they were not side by side—

"* * * it would have been absolutely impossible for defendant Refinery's truck to come up on the Lambach car in climbing up the back of the Lambach car (the only alternative would have been that the Lambach car, backing up in an easterly direction in the southerly of the two westbound lanes, tucked itself under the dual wheels of defendant Refinery's truck, an inconceivable concept!)."

He continues:

"defendant Scheid undertook so to change lanes while defendant Refinery's truck and the Lambach car were so side by side;

"defendant Refinery's dual wheels so climbed up the right rear of the Lambach car;

"the Lambach car spun counter-clockwise, its front was spun counter-clockwise across the center line of, and into the southerly half of the roadway;

"the Fitzgerald car, traveling east on the south half of the roadway, collided head-on with the Lambach car."

He continues:

"Defendant Scheid's testimony generally was against the clear and indisputable physical facts (the left side of defendant Refinery's truck and the right side of Lambach's car collided, and the right rear of the Lambach car was run over by the left rear dual wheels of defendant Refinery's truck) and *first* the scraping noise (obviously the less violent collision of the defendant Refinery's truck and the Lambach car both proceeding in the same direction) and *then* the bang (obviously the head-on collision of the Lambach car and the Fitzgerald car)."

The versions of the two plaintiffs of this accident simply cannot be reconciled. Lambach claims that the truck forced and drove the Lambach car from the south half of the passing lane over across the yellow lines into the path of the Fitzgerald car, while Fitzgerald claims that the truck climbed up the right rear of the Lambach car; that the car then spun counterclockwise across the center of and into the southerly half of the highway; and that the Lambach and Fitzgerald cars then collided.

Appellants' theory of the accident is quite different. They claim that their truck had negotiated the crossover into the southerly of the westbound lanes and was proceeding straight ahead. They claim that, as the truck was traveling at about 35 miles an hour on a gradual uphill curve to the right, the Lambach car pulled around the truck to pass and the driver then suddenly found himself facing the approaching Fitzgerald car and a head-on collision resulted. The collision took place in the eastbound lane. The collision in turn threw the Lambach car back into the left rear portion of the truck with sufficient force to throw the heavy left rear dual wheels out of line, forcing them outward, and to break a heavy bar adjacent to the axle. The Lambach car was thrown into a counterclockwise spin by this contact. Appellants claim that this version is completely consistent with the physical evidence.

The burden in each case is upon the plaintiff to prove by a fair preponderance of the evidence that negligence on the part of defendants

was the proximate cause of the accident. It is not incumbent on defendants to show how the accident happened. This is elementary law. A verdict based on conjecture and speculation cannot be permitted to stand. Among the many cases where the above rules have been applied to the facts being reviewed, we cite the following: MacIntosh v. G. N. Ry. Co. 151 Minn. 527, 188 N. W. 551; Johnson v. Bosch, 178 Minn. 363, 227 N. W. 181; Whitman v. Speckel, 237 Minn. 36, 53 N. W. (2d) 558; Peterson v. Truelson, 249 Minn. 530, 82 N. W. (2d) 236; Yurkew v. Swen, 252 Minn. 277, 89 N. W. (2d) 723; Hanrahan v. Safway Steel Scaffold Co. 233 Minn. 171, 46 N. W. (2d) 243; Routh v. Routh, 256 Minn. 203, 97 N. W. (2d) 644.

In MacIntosh v. G. N. Ry. Co. we said (151 Minn. 530, 188 N. W. 553):

"* * * The general rule of law is well understood. While the evidence in proof of the cause of the accident may be circumstantial, it must not leave it in the field of conjecture. The burden of proof is upon the plaintiff. It is not enough that the evidence be consistent with the theory of the accident. It must go further—it must support it. It must justify an honest inference. It is not enough that it suggest a possibility."

In Routh v. Routh we said (256 Minn. 207, 97 N. W. [2d] 647):

"We have frequently held that a verdict cannot rest on such speculative evidence as we have here. While it is true that in testing the sufficiency of the evidence to sustain a verdict we must accept the evidence most favorable to the verdict and every inference that may fairly be drawn therefrom, it is also true that an inference must be supported by evidence that will justify it. The burden rests on the party asserting the fact to be established to produce such evidence."

In Whitman v. Speckel we said (237 Minn. 42, 53 N. W. [2d] 561):

"The burden rested upon plaintiff to establish such negligence. * * *

"Where evidence presents more than one theory as to the manner in which an accident may have occurred, on only one of which liability could attach to a defendant, proof of the latter must fairly preponderate or the action will fail."

Applying these principles to the facts upon which plaintiffs base a

recovery, what do we find? The Lambach and Fitzgerald cars collided head on, the left front of each car being smashed. The collision took place in the northerly of the eastbound lanes, south of the yellow lines separating the halves of the highway. These facts are undisputed. The Fitzgerald car was proceeding in a lane where it properly belonged, while the Lambach car was proceeding in a lane where, under the law, it did not belong. Ordinarily, in the action in which Fitzgerald sues the representative of the Lambach estate, Lambach's presence in the wrong lane would be prima facie evidence of negligence, and failure to justify or excuse its presence there would lead to liability as a matter of law on the issue of negligence. In the action in which the trustee for Lambach's heirs sues as plaintiff, the presence of the Lambach car in the wrong lane, in the absence of excuse or justification, would defeat recovery unless the presumption created by Minn. St. 602.04[1] permits recovery in spite of its presence there.

The majority of the court is of the opinion that a new trial should be granted. That view is not shared by the author of this opinion, who feels that no additional evidence can be produced so as to change the result and that judgment should therefore be ordered for appellants.

Reversed and new trial granted.

PER CURIAM.

The opinion filed herein on May 19, 1961, is withdrawn and the foregoing opinion is substituted in place thereof and the petition for rehearing is denied.

MURPHY, JUSTICE (concurring specially).

I agree with the result.

KNUTSON, JUSTICE (concurring specially).

I concur in the holding that there should be a new trial. I am con-

---

[1] "In any action to recover damages for negligently causing the death of a person, it shall be presumed that any person whose death resulted from the occurrence giving rise to the action was, at the time of the commission of the alleged negligent act or acts, in the exercise of due care for his own safety. The jury shall be instructed of the existence of such presumption, and shall determine whether the presumption is rebutted by the evidence in the action."

vinced that the verdict in this case is the result of such confusion, in an attempt to apply Minn. St. 602.04, that a new trial is required. It seems to me that the enactment of § 602.04 in 1957 has led to a situation where it is now impossible for a trial court to instruct a jury rationally on the law of negligence where an action in which a third party sues the representative of the estate of a decedent is consolidated for trial with an action in which the trustee for the heirs of the same decedent occupies the position of plaintiff in the death-by-wrongful-act case. In this case, a trustee of Lambach's heirs sues to recover for the benefit of his next of kin. It is conceded that the collision occurred when Lambach's car crossed over the centerline into his wrong lane of traffic. Under these circumstances, a prima facie case of negligence was established which ordinarily would control as a matter of law unless some excuse or justification was established for his being there. But here the court is required to instruct that there is a presumption of due care on the part of the decedent, in the death-by-wrongful-act case, which must be rebutted by defendants. Thus, we have two opposite and inconsistent presumptions, both of which must be overcome by opposing parties.[1]

As we pointed out in TePoel v. Larson, 236 Minn. 482, 53 N. W. (2d) 468, 37 Minn. L. Rev. 629,[2] the burden already rests on defendant to prove contributory negligence of Lambach by a fair preponderance of the evidence. If defendant fails to sustain the requisite burden of proof in that regard, the trustee suing in behalf of Lambach's heirs prevails as a matter of law. But under § 602.04, even though the jury were convinced that Lambach was guilty of contributory negligence which proximately contributed to the accident, it could still find in his favor on the theory that the presumption of due care had not been rebutted. But that is not the worst of it. In the same trial, the representative of Lambach's estate is sued as a defendant. Here he does not have the benefit of the presumption created by § 602.04. Proof of his negligence proximately contributing to the accident in the action

[1]For a discussion of the effect of inconsistent presumptions, see Gausewitz, *Presumptions,* 40 Minn. L. Rev. 391, 398.

[2]See, McCormick, Evidence, p. 664.

in which he is defendant should lead to liability. But suppose that here the jury found him guilty of negligence proximately contributing to the accident but that in the same trial, in the action in which he occupies the position of plaintiff, they find that the presumption of due care has not been rebutted, what then should they do?

It is simply impossible for a court to instruct on or a jury to deal with the legal inconsistency created where in the same trial the representative of a decedent technically occupies positions as both plaintiff and defendant. The presumption of due care of a decedent rests on the theory that the love of life ordinarily will cause a person to exercise due care for his own safety. How is any jury of lay people going to understand that a decedent has such a love of life as to exercise due care when his trustee sues to recover for his death but that he did not have the same love of life when the representative of his estate is sued for his negligence? As long as § 602.04 remains as part of our statutory law, cases in which a trustee of a decedent sues to recover for his death should not be consolidated with cases in which the representative of the estate of the same decedent is sued as a defendant. It is true that the outcome of such litigation will then sometimes depend on who gets to trial first, but even that is better than what we have now. I think that there should be a new trial in which the death-by-wrongful-act case is tried separately. Perhaps then the jury will be able to understand the law applicable to each case.

FRANK T. GALLAGHER, JUSTICE (concurring specially).
I join in the concurring opinion of Mr. Justice Knutson.

NELSON, JUSTICE (concurring specially).
I join in the concurring opinion of Mr. Justice Knutson.

DELL, CHIEF JUSTICE (concurring specially).
While I am inclined to agree with Mr. Commissioner Magney that judgment should be entered for the defendants, nevertheless, I believe that a new trial should be granted in the furtherance of justice.

There was confusion in this case, but it did not come about because of the instruction relating to the presumption of due care as provided by Minn. St. 602.04. It occurred because of the consolidation of cases

which should not have been tried together. From at least the year 1918[1] until 1939, when the opinion of Ryan v. Metropolitan Life Ins. Co. 206 Minn. 562, 289 N. W. 557, was handed down, this court consistently held that it was proper to instruct the jury, in an action to recover damages for death by wrongful act, that the decedent was presumed to have been in the exercise of due care at the time of the accident causing his death. This presumption was based on the law of nature, the universal and insistent instinct of self-preservation. Contributory negligence remained a defense to be established by a fair preponderance of the evidence. The presumption in no way changed this rule.[2] In instructing the jury in death-by-wrongful-act cases the presumption was regularly given. In cases where the decedent was alone at the time of the accident and there was no direct evidence, "the presumption is recognized, and for very evident reasons."[3] While, in the Ryan case, the court for the first time held that the presumption was a "procedural device" rather than of an evidentiary nature, it was pointed out that the court did not mean to say that it would be error for a judge to give the instruction to the jury in a proper case. In attempting to reconcile the views of Mr. Morgan, who disagreed with the Thayer-Wigmore doctrine, the court stated (206 Minn. 568, 289 N. W. 560): "His [Morgan's] conclusion is that there should be a general rule, by 'uniform statute' if need be, 'that the sole effect of every presumption shall be to place upon the opponent the burden of persuading the trier of fact of the nonexistence of the presumed fact.' " It was, however, not until 1952, 13 years after the Ryan case was decided, that this court finally said in TePoel v. Larson, 236 Minn. 482, 493, 53 N. W. (2d) 468, 474:

"We now hold that, where the burden of proving contributory negligence rests on the party against whom a presumption of due care operates, it is error to instruct the jury that there is such presumption. The

---

[1]Carson v. Turrish, 140 Minn. 445, 452, 168 N. W. 349, 352, L. R. A. 1918F, 154.

[2]Aubin v. Duluth St. Ry. Co. 169 Minn. 342, 211 N. W. 580.

[3]Carson v. Turrish, 140 Minn. 445, 452, 168 N. W. 349, 352, L. R. A. 1918F, 154.

rule we adopted in the Ryan case does not permit the trial court to determine whether the presumption should or should not be given. Statements to the contrary in our opinions subsequent to the Ryan case are expressly overruled. The presumption, being a rule of law, under the view we have accepted, should be applied uniformly in all cases where it may be invoked at all."

In the TePoel case this court reviewed the several cases decided after the Ryan case in which the presumption of due care had been given to the jury with approval in death cases and stated (236 Minn. 488, 53 N. W. [2d] 471): "The [Ryan] case has since had rather dubious treatment and subsequent cases have given cause for doubt as to whether we still follow the Ryan case or not."

Only 5 years after the TePoel case was handed down, § 602.04 was enacted. Apparently in an effort to prevent this court from again taking from a decedent the right to have the presumption of due care given as an instruction in a death-by-wrongful-act action, the statute provided: "* * * The jury shall be instructed of the existence of such presumption, and shall determine whether the presumption is rebutted by the evidence in the action." While from a practical standpoint it is entirely proper to instruct a jury as to the presumption of due care except in those cases where the presumption has been rebutted as a matter of law, from a theoretical standpoint it may be wrong to do so.

The author of the foregoing concurring opinion states: "But under § 602.04, even though the jury were convinced that Lambach [in the action to recover for his wrongful death] was guilty of contributory negligence which proximately contributed to the accident, it could still find in his favor on the theory that the presumption of due care had not been rebutted." Obviously this is not a correct statement of the law since, if the jury was convinced that Lambach was guilty of contributory negligence, which proximately contributed to the accident, that ended the presumption of due care and the verdict would then go to the defendant.[4]

Section 602.04 was before us in Roeck v. Halvorson, 254 Minn.

---

[4]Aubin v. Duluth St. Ry. Co. 169 Minn. 342, 211 N. W. 580; see, Roeck v. Halvorson, 254 Minn. 394, 95 N. W. (2d) 172.

394, 95 N. W. (2d) 172. In construing this statute we unanimously said (254 Minn. 399, 95 N. W. [2d] 176):

"In order to understand the intent and purpose of this statute it is necessary to examine the law prior to its passage. Prior to Ryan v. Metropolitan Life Ins. Co. 206 Minn. 562, 289 N. W. 557, we held that the presumption was of an evidentiary nature. See, Aubin v. Duluth St. Ry. Co. 169 Minn. 342, 211 N. W. 580. However, in the Ryan case we held that this presumption was merely a procedural device which shifts the burden of going forward with the evidence. While we had held that the giving of instructions relative to the performance of due care in wrongful death actions, although technically incorrect, did not result in reversible error (Lang v. Chicago & N. W. Ry. Co. 208 Minn. 487, 295 N. W. 57), in TePoel v. Larson, 236 Minn. 482, 53 N. W. (2d) 468, it was declared to be error to instruct the jury with respect to such a presumption because it was only procedural in nature. In view of the foregoing it appears to be the intent of the legislature to restore the evidentiary conception of the presumption as it existed prior to the Ryan and TePoel decisions."

We also pointed out in the Roeck case that in order to avoid rendering the statute unconstitutional, as constituting a deprivation of judicial power granted by the constitution, it was the duty of the courts in appropriate cases to decide as a matter of law that the presumption of due care had been rebutted.[5] It appears quite clearly that the legislature intended, in enacting § 602.04, to return to the procedure which was in force in this state for almost 35 years. I can see nothing wrong with this statute, if restraint is properly exercised to make sure that only cases that can be properly tried together are consolidated for trial.

These cases were consolidated for trial upon motion under Rule 42.01 of Rules of Civil Procedure. This should not have been done. As members of this court we know that the consolidation of some cases

---

[5]See, also, Kernan v. St. Paul City Ry. Co. 64 Minn. 312, 67 N. W. 71; Nelson v. Minneapolis, St. P. & S. S. M. Ry. Co. 260 Minn. 61, 108 N. W. (2d) 720.

has resulted in more confusion, longer and more complicated trials, with perverse verdicts, than existed under the old practice.[6]

The Rules of Civil Procedure were promulgated by this court on June 25, 1951, pursuant to authority vested in the court by L. 1947, c. 498. They became effective January 1, 1952. Their object was to secure the just and speedy disposition of cases, to relieve the courts and lawyers of work, and to further justice with less expense to the litigants.

It is a matter of common knowledge that some lawyers, and judges as well, claim that the rules have not accomplished the purpose for which they were promulgated. They also contend, and with some justification, that the consolidation of cases, discovery and pretrial procedure, as well as the use of other of the rules, have resulted in more confusion, more work for the courts and the lawyers, more expense to the litigants, and also delays and appeals, than existed under the prior statutory practice and procedure.

Sufficient time has now elapsed so that an investigation could be made, if the legislature so desired, to determine whether the rules are bringing about the desired result. Should that be done it would seem that it could best be made by a legislative interim committee. L. 1947, c. 498, § 8, provides as follows:

"This act shall not abridge the right of the legislature to enact, modify, or repeal any statute or modify or repeal any rule of the supreme court adopted pursuant thereto."

MR. JUSTICE OTIS took no part in the consideration or decision of this case.

---

[6]For example, in addition to this case, see Lott v. Davidson, 261 Minn. 130, 109 N. W. (2d) 336.