PATRICIA LOTT v. GEORGE R. DAVIDSON, d.b.a. RED AND WHITE AIRWAY TAXI COMPANY, AND OTHERS. EUGENE A. ALTON AND ANOTHER, APPELLANTS. MARIE G. SPATH, A MINOR, BY ALLEN N. SPATH, HER FATHER AND NATURAL GUARDIAN, v. MICHAEL E. ALTON AND ANOTHER. GEORGE R. DAVIDSON, d.b.a. RED AND WHITE AIRWAY TAXI COMPANY, THIRD-PARTY DEFENDANT. BETTY RAYMOND v. MICHAEL E. ALTON AND ANOTHER. GEORGE R. DAVIDSON, d.b.a. AIRWAY TAXI, v. EUGENE ALTON AND ANOTHER.

109 N. W. (2d) 336.

May 19,1961—Nos. 38,065, 38,066, 38,067, 38,071.

132

*Meagher, Geer, Markham & Anderson, M. J. Coyne,* and *O. C. Adamson II,* for appellants.

*Minenko, Feinberg, Mirviss, Meyers & Schumacher,* for respondent Lott.

*Schermer, Gensler & Shields,* for respondent Davidson.

*Theodore Rothman,* for respondent Spath.

*Samuel G. Smilow,* for respondent Raymond.

MURPHY, JUSTICE.

The four cases involved in this appeal arose out of a collision at an uncontrolled intersection at Sixth Avenue North and Fourth Street in Minneapolis. An Oldsmobile owned by Eugene Alton and driven by Michael Alton, going east on Fourth Street, collided with a taxicab operated by Gary Raymond, who was going north on Sixth Avenue. Raymond, who was employed by Red and White Airway Taxi Company, was killed in the accident. Patricia Lott, a passenger in the taxicab, was injured, as was Marie Spath, a passenger in the Alton car. The four actions involve suits (1) by Patricia Lott against the Altons and the owner of the taxicab; (2) by Marie Spath against the Altons and the owner of the taxicab; (3) by Betty Raymond, surviving wife of the taxicab driver, against the Altons; and (4) by George Davidson,

doing business as Red and White Airway Taxi Company, against the Altons for property damages.

The Altons appeal from orders of the district court denying a new trial. As grounds therefor they assert that the finding of the jury that the taxicab driver exercised due care and that his conduct was not a contributing cause of the accident is contrary to the evidence; that the failure of the driver of the taxicab to exercise the highest degree of care for the safety of his passenger constituted a contributing cause of the passenger's injuries; that the court's instructions with reference to the right-of-way in an uncontrolled intersection were erroneous and prejudicial; that they were denied a fair trial because of misconduct in argument to the jury; and that the court erred in instructing the jury with reference to the presumption of due care as provided by Minn. St. 602.04 on the ground that that particular statute is claimed to be unconstitutional as repugnant to the equal protection clause.

From an examination of the record it appears that the jury could have found these facts: On the evening of May 17, 1958, Michael Alton, then 19 years of age, and his fiancee, Marie Spath (now Mrs. Marie Teschendorf), drove to a place near the north edge of Minneapolis, where they stopped to discuss Marie's intended journey to California to live with her mother. Michael planned to enter the United States Navy, and since he wished Marie to remain in Minneapolis until his departure, the young people had a difference of opinion concerning her plans. It appears that this discussion left Alton in a highly emotional state. It is not disputed that on their return trip to downtown Minneapolis Alton drove at an excessive rate of speed. Marie asked him to slow down and told him that she wanted to get out of the car. She was asked, "Did you continue to ask him to slow down or that you wanted to get out from the time he started to speed until the time of the accident?" and she answered, "Yes, sir." She testified that he did slow down to some extent, probably by applying his brakes just prior to the collision, so that he was traveling between 30 and 40 miles an hour at the time he struck the taxicab. Alton admitted that he was traveling 40 to 50 miles an hour in the block just before the intersection where the accident occurred. He stated that when he was approximately three car lengths from the intersection line he saw the cab,

which was then one car length from the intersection line, at which time he applied his brakes and slowed down somewhat. After the accident, Alton told one of the police officers that he was proceeding at a speed of 45 to 50 miles an hour just prior to the time he saw the cab enter the intersection.

It appears that the point of impact was in the southeast quarter of the intersection. At this intersection Fourth Street is 42 feet 6 inches wide, and Sixth Avenue is 54 feet 4 inches wide. There is a building on the southwest corner of the intersection extending to the sidewalk. There is no direct evidence as to the width of the sidewalk but from a plat and exhibits it appears to be 10 to 15 feet. Obviously, this building would interfere with the view of both drivers until they were quite close to the intersection. The testimony of the witness George Smykalski was of significance. He was standing on the sidewalk along Fourth Street North about three blocks west of the intersection where the collision occurred. His attention was attracted by the speed of the Alton car as it passed. He estimated that it was traveling at a rate of approximately 60 miles an hour. He watched the car, as if in expectation that an accident might happen. As the Alton car entered the intersection of Fourth Street with Sixth Avenue North, he noticed the dome light of the cab come into view and then perceived from the headlights the spinning motion of the cars. This witness could not, of course, form an opinion as to the speed of the cab, but he did testify that at no time did the brake lights on the Alton car indicate that Alton had applied the brakes.

While Michael Alton and Marie were on their way back to downtown Minneapolis, Patricia Lott entered the Red and White cab operated by Gary Raymond at 1123 Irving Avenue North. The cab proceeded along Sixth Avenue to the intersection with Fourth Street, where the collision occurred. It appears that Mrs. Lott sustained a loss of memory beginning at or about the time of impact or at the time the car entered the intersection a few feet before the impact. She testified that up to the time she lost her memory the cab was going approximately 30 miles an hour and that "[i]t could have been faster, could have been slower."

At the conclusion of the testimony the court instructed the jury that

Michael E. Alton was negligent as a matter of law and that his negligence was a proximate cause of the collision. The court then submitted the following interrogatories:

(1) "Was Gary L. Raymond negligent in the sense of failing to exercise reasonable care in the operation of George R. Davidson's taxicab?" This question was answered in the negative by a ten and two verdict.

(2) "If your answer to Question 1 is Yes, then was Gary L. Raymond's negligence in failing to exercise reasonable care a proximate cause of this collision?" This question was answered in the negative by an eleven and one verdict.

(3) "Was Gary L. Raymond negligent in the sense of failing to exercise the highest degree of care for the safety of his passenger in the operation of George R. Davidson's taxicab?" This interrogatory was answered unanimously in the affirmative.

(4) "If your answer to Question 3 is Yes, then was Gary L. Raymond's negligence in failing to exercise the highest degree of care for the safety of his passenger a proximate cause of injuries to his passenger?" The answer to this interrogatory was unanimously in the negative.

(5) "Was Marie Spath Teschendorf negligent in the sense of failing to exercise reasonable care?" The answer to this interrogatory was unanimously in the negative.

(6) "Did Marie Spath Teschendorf assume the risk of riding as a passenger in the car being driven by Michael E. Alton?" The answer to this interrogatory was unanimously in the negative.

■ Appellants earnestly contend that the cab driver, Raymond, not only failed to exercise the high degree of care he owed as a common carrier to his passenger but failed as well to exercise ordinary care in the operation of the cab and that his negligence was a contributing cause to the collision. This argument is based primarily upon the testimony of Patricia Lott to the effect that the taxi driver operated his vehicle at a speed of about 30 miles per hour along the route of travel, continuing at the same rate after it entered the intersection. The argument is supported by estimates of speed and distances, which it is said

compel the conclusion that both vehicles entered the intersection at unreasonable speeds under the circumstances. It is then argued that because of the cab driver's unreasonable speed his right-of-way was forfeited; that the speed and heedlessness of both drivers made the collision inevitable; and that the accident could not have occurred but for the concurrent negligence of both drivers. The fatal weakness of appellants' argument is that it presupposes circumstances which the jury obviously found did not exist. The facts have fully been considered by the jury and the court and have been resolved against appellants. It is for the jury to decide disputed claims and questions of fact in the light of the evidence introduced under instructions of the court as to the law. On the record as a whole, and particularly on the basis of Michael Alton's testimony as to the relative positions of his vehicle and the taxicab at the time they approached the intersection, the jury could have found that the speed of the taxicab at the time of impact was about 21 or 22 miles per hour.

Conflicts in evidence are to be resolved by the jury. We must review the evidence and the inferences to be reasonably drawn therefrom in the light most favorable to the prevailing parties. It is only when different minds can reasonably arrive at but one result that fact issues become questions of law justifying a court in substituting its judgment for the jury's. Where, as here, the verdict has the approval of the trial court and it is not manifestly and palpably contrary to the evidence viewed as a whole, it will not be disturbed.[1]

■ Appellants next contend that the failure of the driver of the taxicab to exercise the highest degree of care for the safety of his passenger constituted a contributing cause of the passenger's injuries. While the jury in answer to the special interrogatories found that the taxicab driver failed to exercise the highest degree of care, it also determined that that failure was not the proximate cause of the accident. It is apparently appellants' claim that the finding of the jury

---

[1]Ballweber v. Kleist, 248 Minn. 102, 78 N. W. (2d) 671; Dahling v. Dammann, 251 Minn. 171, 87 N. W. (2d) 25; Schleuder v. Soltow, 239 Minn. 453, 59 N. W. (2d) 320; Jablinske v. Eckstrom, 247 Minn. 140, 76 N. W. (2d) 654; Ryan v. Griffin, 241 Minn. 91, 62 N. W. (2d) 504.

that the taxicab driver failed to exercise the degree of care it owed to the passenger is inconsistent with its finding that the negligence of Michael Alton was the sole proximate cause of the accident. We see no difficulty in reconciling these two findings. The court fully and fairly instructed the jury as to the standard of care required of the taxicab driver to his passenger on the one hand and, to the general public on the other.[2] We are of the view that the record fully supports the findings of the jury under these instructions that, while the cab driver failed to exercise the highest degree of care owed to his passenger, this failure did not constitute a breach of the duty the man of ordinary prudence owes to others under similar circumstances. Assuming the speed of the cab was reasonable in so far as the general public was concerned, it was nonetheless within the province of the jury to find that even a speed appropriate to the high degree of care required toward a passenger would not have prevented the accident. The jury could well have concluded that the negligence of the cab driver toward his passenger was superseded by the negligence of Michael Alton and that Alton's speed was such as to leave no time for Raymond to take corrective action to avoid the impact.

We cannot agree that the record compels a conclusion that the conduct of the taxi driver was a proximate cause of the accident as a matter of law. Here again, the facts are not susceptible to a single inference. It was for the jury in the exercise of their broad powers

---

[2]The court concluded his instruction on that subject with this summary:

"Under the evidence here as one alternative you may find that Gary Raymond failed to exercise reasonable care, and if you so find, then necessarily you must also find that he failed to exercise the highest degree of care for the safety of his passenger.

"As another alternative you may find that Gary Raymond exercised reasonable care but that he failed to exercise the highest degree of care for the safety of his passenger.

"As another alternative, and there are three alternatives in all here, you may find that Gary Raymond exercised the highest degree of care for the safety of his passenger, and if you so find, then, necessarily you must also find that he exercised reasonable care."

with respect to the drawing of inferences from the evidence, even when it is undisputed, to determine the issue of causation.[3]

■ It is next contended that the trial court erred in his instructions relative to the right-of-way of vehicles in an uncontrolled intersection. Minn. St. 169.20, subd. 1. It is asserted that the error is to be found in the following instruction:

"There is a provision in our Highway Traffic Regulation Act relating to the right-of-way as between two vehicles which enter an intersection from intersecting streets or highways at which there is no traffic control signal. That is the type of intersection we have here. That section reads, and I quote: 'When two vehicles enter an uncontrolled intersection from different highways at approximately the same speed, the driver of the vehicle on the left shall yield the right-of-way to the vehicle on the right.' Under this law the driver on the left must yield the right-of-way to the driver coming from the right where there is reasonable likelihood of a collision if both vehicles continue their respective courses and maintain their respective speeds, because under those circumstances the vehicles have entered the intersection at approximately the same time.

"This law concerning the right-of-way has a special provision concerning forfeiture of the right-of-way which reads: 'The driver of any vehicle traveling at an unlawful speed shall forfeit any right-of-way which he might otherwise have hereunder.' "

While it is conceded that the right-of-way statute was correctly read to the jury, the claim is made that the explanation of it conflicted with its provisions and constituted "a rule which became effective only when there was a reasonable likelihood of an accident and which imposed an absolute duty on the driver approaching from the left to yield to the driver approaching from the right regardless whether the driver on the right was driving at 10 or 100 miles per hour. Only by superimposing the statutory rule on the Court's explanation could the

---

[3]Dahling v. Dammann, *supra;* Simon v. Carroll, 241 Minn. 211, 62 N. W. (2d) 822; Chicago, St. P. M. & O. Ry. Co. v. Washington (8 Cir.) 179 F. (2d) 548.

jury reach a proper understanding of the rule, * * *." It is thus specifically contended that the trial court erred in failing to explain to the jury that the right-of-way statute applied only where the operators of the vehicles entering the intersection were driving at lawful speeds.

We cannot agree that the jury was misled or incorrectly instructed on the law as to right-of-way at intersections. In Draxten v. Brown, 197 Minn. 511, 267 N. W. 498, relied upon by the appellants, the trial court advised the jury that a motorist driving at an unlawful rate of speed forfeited the right-of-way. It then instructed the jury that, if a collision were imminent between two motorists entering the intersection at approximately the same time, the motorist on the left must yield to the motorist on the right, and the failure to do so would constitute negligence. As a result of the unfortunate juxtaposition of the two instructions as to indicate that the forfeiture did not apply if a collision were imminent, the instruction was held to be faulty. We concluded that the jury could find under these instructions that (197 Minn. 515, 267 N. W. 500) "when the collision became imminent the Browns were charged with negligence if they failed to yield the right of way to Goldie, who, the jury could find, had forfeited it."

While it might have been more accurate for the court in his explanation of § 169.20, subd. 1, to have pointed out that the favored driver had the benefit of the right-of-way only so long as he was driving at a lawful speed, we conclude from an examination of the instructions as a whole that the jury was not misled. The provisions of the statute were read to the jury in proper sequence. The general rule with reference to the right-of-way at uncontrolled intersections was fairly stated to the jury and was followed by the qualification that it could be forfeited by unlawful speed. We think the charge fairly and correctly stated the applicable law from a practical point of view. The instruction of the trial court must be viewed in its entirety and all that is required is that it convey to the jury a clear and correct understanding of the law. "It is unnecessary that every possible opportunity for misapprehension be guarded against."[4]

■ The next point raised by appellants relates to an asserted prej-

---

[4]Cameron v. Evans, 241 Minn. 200, 209, 62 N. W. (2d) 793, 798.

udicial statement made by counsel for plaintiff Betty Raymond in his argument to the jury. The offending statement is as follows:

"I suppose by the standards of some of the counsel I have been derelict in my duty. I should have had the widow of Gary Raymond here dressed in widow's weeds, I should have had little Scott Raymond here—and I assure you that he is young enough yet that he wouldn't need any prodding to make him cry once in a while to let you know that he is fatherless—"

It is conceded the statement was improper, and no attempt is made to defend it. At the time it was made, counsel for Marie Spath interrupted and made objection. The court sustained the objection and admonished the jury to disregard the statement. Later on, after the arguments were completed, a discussion was had in chambers, at which time counsel for respondent Spath again excepted to the improper remark. He did not ask for a mistrial, however. Thereafter the following occurred:

"Mr. Geer [attorney for appellants]: We concur in that objection. We think Mr. Smilow's argument was completely out of keeping and he continued even after counsel, Mr. Rothman, objected, and continued on the subject matter after the Court directed him not to. We would have objected had it not been for Mr. Rothman taking objection and the Court admonishing counsel at the time. I think the argument was very inappropriate.

"The Court: Do you move for a mistrial at this time, Mr. Geer?

"Mr. Geer: No. I don't move for a mistrial after six days, but I want that error noted."

Was the misconduct of counsel for Betty Raymond in appealing to the sympathy of the jury such error as to deprive appellants of a fair trial? Concededly, the trial court was in a better position to make a judgment on this question than are we. Generally, whether there should be a new trial for misconduct of counsel in closing arguments to the jury rests almost entirely in the discretion of the trial court. Smith v. G. N. Ry. Co. 133 Minn. 192, 158 N. W. 46; Patton v. Minneapolis St. Ry. Co. 247 Minn. 368, 77 N. W. (2d) 433, 58 A. L. R. (2d)

921. From an examination of the record, it appears that the trial court carefully admonished the jury to disregard the improper remarks and later advised them in his charge that they were not to permit considerations of sympathy to affect their judgment. They were told to follow the court's instructions and to base their verdict entirely upon the evidence adduced. From a review of the record and a full consideration of the circumstances surrounding the admitted improper argument, we cannot say that they are such as to warrant our holding that the trial court abused its discretion in denying a new trial.

This point should not be passed over without making some observation as to the atmosphere in which the improper argument was made. The issues were bitterly contested. One of the attorneys in his brief characterized the proceedings: "As the trial of a lawsuit, it was a 'battle royal' with each lawyer heckling all the others." Of a transcript of approximately 500 pages, over 150 pages are devoted to arguments between counsel and discussion with the court in chambers. This case again demonstrates that consolidation of cases for trial does not necessarily expedite the work of the court.[5] The spleen which was generated in this trial manifestly arose from the consolidation, which involved serious difficulties because of varying rules as to presumptions, standards of care, and conflicts in rules of evidence as they applied to the different parties. We are satisfied, however, from an examination of the record that, aside from the objectionable argument, the decorum of the attorneys in the presence of the jury was not improper and that the trial court managed to have the evidence presented to the jury in an orderly manner so that they could intelligently and fairly answer the special interrogatories submitted to them.

■ In his instructions the trial court informed the jury of § 602.04 (L. 1957, c. 949), which creates a presumption of due care in certain negligence actions and provides:

"In any action to recover damages for negligently causing the death of a person, it shall be presumed that any person whose death resulted from the occurrence giving rise to the action was, at the time of the

[5]Lambach v. Northwestern Refining Co. Inc. 261 Minn. 115, 111 N. W. (2d) 345.

commission of the alleged negligent act or acts, in the exercise of due care for his own safety. The jury shall be instructed of the existence of such presumption, and shall determine whether the presumption is rebutted by the evidence in the action."[6]

Appellants argue that this section of the statute is unconstitutional as repugnant to the equal protection clause. We have held that the power of the legislature to modify or change a remedy, provided no substantial right is impaired, cannot be questioned. And there is no such thing as a vested right to a particular remedy. Straw & Ellsworth Mfg. Co. v. L. D. Kilbourne Boot & Shoe Co. 80 Minn. 125, 83 N. W. 36. The legislature may always alter the form of administering justice. Applying this principle to presumptions in State ex rel. Robertson v. New England Furniture & Carpet Co. 126 Minn. 78, 84, 147 N. W. 951, 953, 52 L. R. A. (N. S.) 932, we said that a rule of presumption "is simply a rule changing the burden of proof, i. e., declaring that the main fact will be inferred or assumed from some other fact until evidence to the contrary is introduced * * *. There is not the least doubt, on principle, that the legislature has entire control over such rules, as it has over all other rules of procedure in general and evidence in particular * * *—subject only to the limitations of evidence expressly enshrined in the Constitution."

■ Appellants, however, particularize their objection by saying that the statute is unconstitutional as applied to them, arguing that it represents class legislation in that it provides benefits to deceased parties in an action for death by wrongful act which are denied to a deceased defendant in a negligence action involving injury to a living plaintiff. Appellants support their position with this argument:

"* * * Obviously, if both the plaintiff and the defendant are living, the statute has no application, and the issue of its constitutionality cannot be raised. If in an action for negligently causing the death of the plaintiff's decedent the defendant is also dead, the presumption

---

[6]This statute has been considered by this court in three recent appeals: Ekstrom v. Harmon, 256 Minn. 166, 98 N. W. (2d) 241; Roeck v. Halvorson, 254 Minn. 394, 95 N. W. (2d) 172; and Lambach v. Northwestern Refining Co. Inc. 261 Minn. 115, 111 N. W. (2d) 345.

created by the statute is applicable to both plaintiff's decedent and defendant, and neither is injuriously affected by it. If the plaintiff is living and the defendant dead, the statute, which by its terms creates a presumption of due care only in an action to recover damages for negligently causing the death of a person, can never come into operation. Accordingly, the dead defendant cannot question its constitutionality—the application of the statute simply is not in issue."[7]

It is unnecessary for us to assume that the premise upon which this argument is based correctly conceives the application of the statute. It is sufficient to say that it is an elementary doctrine of constitutional law that one who invokes the power of the court to declare a statute to be unconstitutional must be able to show not only that the statute is invalid but that he has sustained or is in immediate danger of sustaining some direct injury resulting from its enforcement and not merely that he suffers in some indefinite way in common with people generally. The power of the court to declare a law unconstitutional is to be exercised only when absolutely necessary in a particular case. In Mesaba Loan Co. v. Sher, 203 Minn. 589, 595, 282 N. W. 823, 827, we said:

"A party attacking the constitutionality of a statute must show that it affects his rights in an unconstitutional manner. That it so affects the rights of others is no concern of his. He may champion his own but not the rights of others."

In the case before us appellants are living defendants, and whether it is unfair to restrict the benefits of the statutory presumption to some decedents while denying them to others can be only a matter of academic interest to them. State ex rel. Clinton Falls Nursery Co. v. County

---

[7]Appellants state in a footnote to their reply brief that they are of the opinion "that M. S. A. 602.04, by its terms, applies to defendant's decedent in an action brought against him for the wrongful death of plaintiff's decedent." Presumably this is interpretation on authority of Groh v. Bassett, 7 Minn. 254 at 259 (325 at 330), which states:

"* * * It is a rule of construction, that where a statute grants relief to one class of persons, as for instance defendants, it may always be extended to plaintiffs when within the spirit and intent of the act. 6 How. Pr. R. 326."

144

of Steele, 181 Minn. 427, 232 N. W. 737, 71 A. L. R. 1190; Minneapolis Gas Co. v. Zimmerman, 253 Minn. 164, 91 N. W. (2d) 642; Kaljuste v. Hennepin County Sanatorium Comm. 240 Minn. 407, 61 N. W. (2d) 757; State v. Industrial Tool & Die Works, Inc. 220 Minn. 591, 21 N. W. (2d) 31.

Affirmed.

MR. JUSTICE OTIS, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.