**Avis HOLMES and Lena Bivens, Jointly and Individually, Plaintiffs,**

v.

**Thomas LEADBETTER, City Clerk of the City of Detroit, and City of Detroit, a Municipal Corporation, Defendants.**

**Civ. A. No. 31343.**

United States District Court
E. D. Michigan, S. D.

Aug. 16, 1968.

Arthur M. Bowman, Detroit, Mich., for plaintiffs.

Robert Reese, Corp. Counsel, City of Detroit, Thomas H. Gallagher, Asst. Corp. Counsel, Maurice Kelman, Detroit, Mich., Special Counsel for City of Detroit, for defendants.

OPINION

TALBOT SMITH, District Judge.

Plaintiffs, Negro residents of the City of Detroit, representing themselves and other Negro residents and citizens of Detroit as a class, seek injunctive relief. Jurisdiction is based upon the Civil Rights Act, § 1343(3), Title 28, and

Section 1982, Title 42, United States Code. The action concerns Detroit's Fair Housing Ordinance, sometimes referred to as "Open Housing."

In November of 1967 the Common Council of the City of Detroit enacted what was entitled a "Fair Housing Ordinance," No. 300G of Ch. 2, Article 7 of the Code of Detroit, effective December 31, 1967.

Following much activity on the part of those opposed to the ordinance, in January of 1968 the Common Council received a "Petition for Referendum on City Ordinances" requesting repeal of the aforedescribed Fair Housing Ordinance.[1] Acting under the authority of T.3, C.2, § 10 of the Charter of the City of Detroit,[2] the City Clerk, Defendant Thomas Leadbetter, it is stipulated,[3] will submit this ordinance to the electors of the city at the next election. It is to restrain such submission that this action is brought.

In the interests of a speedy determination (in view of the proximity of the cut-off date for the printing of ballots for the next election, at which time the referendum would normally be submitted) it has been agreed that the Court may consider the case upon briefs, oral arguments and stipulated facts, and that permanent as well as preliminary injunction will now be ruled upon. In order, also, that appeal may be expedited, should either party desire appeal, this opinion will serve as findings of fact and conclusions of law. Rule 52(a), F.R. Civ.P.

■ At the outset we will consider two initial arguments made, one bearing upon the position of the defendants in this litigation, going to jurisdiction, the other upon the essential validity of judicial action with respect to the electoral process. So far as the first is concerned the respondents urge that the position of the city in this matter is essentially one of a disinterested bystander, hence that there is actually no case or controversy between the parties. This position is based upon the proposition that when a referendum petition in due form is properly submitted, and other conditions are met, there is no alternative to putting it on the ballot, regardless of its subject matter. This is indeed a comfortable position, but as we read the cases it is not the law. The books are replete with instances wherein City Councils have refused to place propositions upon the ballots for various reasons. See, McQuillan, Municipal Corporations, 3rd ed. § 16.53 et seq. In fact, in the Michigan case of Burns v. Stenholm, 310 Mich. 639, 17 N.W.2d 781, the Court denied a mandamus to the City Commission of Ironwood to compel them to either adopt an ordinance or submit it to the electors of the city. Moreover, as to the matter of controversy with the defendants, it is undisputed that the

1. It is stipulated: "That the sponsors of the proposed referendum on Detroit Ordinance #300G, commonly known as the 'Fair Housing Ordinance,' on or about December 29, 1967, filed with the City Clerk 5,797 supporting petitions bearing approximately 101,530 signatures, and that it was necessary for said Clerk to validate and certify only 44,410 of such signatures in order to satisfy the requirements of Title III, Chapter 2, Section 10 of the Detroit City Charter."

2. "Sec. 10. *Referendum on ordinances.* Every ordinance passed by council, except emergency ordinances, as defined in this Chapter, shall be subject to the referendum, if at any time, before taking effect as herein provided, a petition signed by electors equal in number to ten per cent of the total vote cast for the office of mayor at the last preceding city election at which a mayor was chosen be filed with the city clerk, requesting that such ordinance be repealed by the council or be submitted to the qualified electors for their approval or rejection."

3. "The City Clerk certified that the petition had the necessary number of bona fide signatures and transmitted the petition to the Council on or about the 16th day of January, 1968, and as of this date the Council has failed to repeal the within mentioned ordinance, making it necessary that the ordinance shall be submitted to the electorate for their approval or rejection."

proposition is to be placed upon the ballot by defendants, to the plaintiffs' alleged detriment, unless restrained by this Court. Mandamus, we will note, might well have been a more satisfactory vehicle for bringing the issues now before us to decision, since in such case the protagonists of the referendum would have been forced themselves to take affirmative action, but we take the case as we find it and at any rate we are satisfied that there is a controversy between the plaintiffs and the defendants.

■■ It is urged, also, to us that we should not permit a Court to be drawn into what is only a matter (at this stage, at any rate) for the electorate. We agree completely with defendants that the entry of the Court into any stage of the electoral process is a step to be taken only with the utmost caution. But we sit here as a Chancellor. Should the result of our weighing of the equities in the light of settled principles result in our conviction that irreparable harm is likely to result should we fail to act, our course is clear. The fact that an election is involved is, to lapse into the familiar language of the negligence cases, only one of the surrounding circumstances we must consider. It is clear that a United States District Court has the power to enjoin, under proper circumstances, the holding of an election. Hamer v. Campbell, 358 F.2d 215 (C.A. 5, 1966). See, also, Alabama v. United States, 304 F.2d 583 (C.A. 5, 1962), as well as Annotation in 94 A.L.R. 812 (1935), which contains much pertinent material, Tolbert v. Long, 134 Ga. 292, 67 S.E. 826; Baum v. City of St. Louis, 343 Mo. 738, 123 S.W.2d 48; Calkins v. Hare, 228 F.Supp. 824, E.D.Mich.1964. In recent situations involving the enjoining of elections concerning open housing, see Otey v. Common Council of City of Milwaukee, D.C.,

281 F.Supp. 264, 1968, (permanent injunction granted) and Ranjel v. City of Lansing, 293 F.Supp. 301, W.D.Mich. 1968, Unrep. (permanent injunction granted).

We will turn at once to the merits, to the jugular, so to speak. It is argued by respondents that the electorate is entitled to have any question submitted to it, and that if the voters reject open housing, plaintiffs' rights will nevertheless remain safeguarded by federal and state guarantees. It is argued, also, that in such event there would be, so far as the city is concerned, no more than a restoration of the *status quo ante*. This argument is based upon the proposition that the Common Council might have kept hands off the issue in the first instance, might, at such time, have adopted a position of strict neutrality. Cf. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967). This being the case, it is said, the rejection of the Open Housing Ordinance would result merely in an affirmation of a neutral position regarding private discrimination, so far as the ordinances of the city are concerned. The argument, in short, is that rejection of the Fair Housing Ordinance by the referendum vote would result simply in doing now what could have been done then, prior to the passage of the Fair Housing Ordinance, and thus the vote is legally unassailable.

The problem here is with the words "now" and "then". The *status quo* cannot be re-established. Too much has happened, locally and legally. It was only after riot and bloodshed in our community, attributable in part at least, according to petitioners, to the sub-standard conditions under which many of our people live, (amply substantiated by stipulations of record)[4] that the Common

---

4. Report of the National Advisory Commission on Civil Disorders, Bantam ed., pub. March 1968. The stipulations on this subject are as follows: "The Detroit Urban League prepared a survey describing the status of the Negro in the housing field. It showed that eleven percent

(11%) of the white occupied housing in Detroit is substandard, while twenty seven percent (27%) of Negro occupied is substandard. A major portion of the Negro occupied housing is blighted. Over three quarters (¾%) of the Negro occupied housing units are over thirty

Council passed the ordinance above quoted, a referendum on which is now sought. It provides as follows:

"IT IS HEREBY ORDAINED BY THE PEOPLE OF THE CITY OF DETROIT:

Section 1. That Chapter 2, Article 7 of the Code of the City of Detroit be amended by adding new sections to be known as sections 2-7-6.8, 2-7-6.9, 2-7-6.10, 2-7-6.11, 2-7-6.12, 2-7-6.13, and 2-7-6.14, to read as follows:

Sec. 2-7-6.8. No person shall be denied the equal protection of the laws, nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin.

Sec. 2-7-6.9. It is hereby found that discrimination in housing violates the public policy of the City, as heretofore expressed by resolution of this Council, and that such discrimination in housing is injurious to the public health, safety and general welfare of the people of the City of Detroit and to the citizens thereof.

Sec. 2-7-6.10. No owner of real property, lessee, sublessee, real estate broker or salesman, lender, financial institution, advertiser, or agent of any of the foregoing shall discriminate against any other person because of the religion, race, color or national origin, of such other person or because of the religion, race, color or national origin of the friends or associates of such other person, in regard to the sale or rental of, or dealings concerning, real property located in the City of Detroit.

Sec. 2-7-6.11. The provisions of this ordinance shall not apply to the rental of a room or rooms to three or less persons in a single dwelling unit, the remainder of which dwelling unit is occupied by (1) the owner or member of his immediate family, or (2) a lessee of the entire dwelling unit or members of his immediate family.

Sec. 2-7-6.12. Nothing in this ordinance shall require an owner to offer property to the public at large before selling or renting it, nor shall the ordinance be deemed to prohibit owners from giving preference to prospective tenants or buyers for any reason other than religion, race, color or national origin.

Sec. 2-7-6.13. The Detroit Commission on Community Relations shall be empowered to enforce the provisions of this ordinance, and to investigate all complaints, or initiate investigation hereunder. It may sign a complaint against any person as defined hereinbefore, in the City of Detroit for trial before the Traffic and Ordinance Court of the City of Detroit for the violation of the terms of this ordinance.

Sec. 2-7-6.14. The Detroit Commission on Community Relations shall be empowered to make rules for the conduct of its business; to hold hearings, to make the results of its work and/or information collected in the course of investigations under this ordinance available to duly authorized agencies and departments of the State of Michigan engaged in the work of regulating and/or controlling discriminatory housing practices.

Section 2. All ordinances or parts of ordinances in conflict herewith are hereby repealed only to the extent necessary to give this ordinance full force and effect."

Moreover, whatever may have been the situation as to the "right" to private discrimination prior to Jones v. Alfred

years old, while only one half (½%) of the white occupied units are that old.
A survey of the attitudes of Detroit Negroes after the civil disturbance of 1967 incorporated into the Kerner Commission Report to the President, shows that over crowded living conditions and poor housing rank as the second and third most serious grievance which contributed to the disturbance."

H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), that case squarely held as follows:

> "We hold that § 1982 bars all racial discrimination, private as well as public, in the sale or rental of property, and that the statute, thus construed, is a valid exercise of the power of Congress to enforce the Thirteenth Amendment." [footnote omitted]

Thus both legally and factually it is utterly impossible to return to the *status quo*. A vote of the people to wipe out the ordinance would be completely nugatory, in the sense that the principles expressed therein would still remain the law governing the conduct of our people.

This is all upon the assumption that what is sought in such referendum is "merely" the restoration of the *status quo*. But that conclusion we must reject. It completely disregards what has happened to us. It is our judgment that in the light of the representations made to us by stipulation and argument, in the context of the local situation, the disturbances between certain elements of both whites and blacks prior to and after the riot, the housing conditions prevailing in our community, the timing of the passage of the ordinance, and the atmosphere in which we now find ourselves, the repeal by referendum of the Fair Housing Ordinance would not be construed merely as a routine rescission of a legislative measure but taken by many as an invitation to further unlawful and unconstitutional discrimination. The point is well illustrated in the Kerner Report, much of which is devoted to the tragic situation in our community, a portion of which has been stipulated to us, see note 3 hereof. We find on page 152 of such Report the following paragraph:

> "There are signs of increased hostility toward Negroes in the white community. One white extremist organization reportedly proposes that whites arm themselves for the holocaust it prophesies. A movement to recall the mayor has gained strength since the riot, *and its leader has also pressed to have the fair housing ordinance passed by the Detroit Common Council put to a referendum.*" [Italics ours]

We cite this paragraph not as factual proof of its contents nor as stipulated to us at this particular point, but as bearing upon a matter not susceptible of mathematical proof, namely, a public state of mind going to the point that repeal in our city of its Fair Housing Ordinance would, indeed, warrant the deleterious construction above described.

The basic core of the defendant's argument with respect to the possible rejection of Fair Housing by referendum is that the elimination of a positive declaration does not establish nor should it imply a negation of the principles of the positive. This may be unassailable as a matter of theoretical logic, although this is far from an inevitable conclusion, but we are considering basic constitutional rights, not logician's theorems. Translated, this argument means that the referendary rejection of Section 2-7-6.8, stating that "No person shall * * * be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin", would have no significance as to the right to equal protection or the enjoyment of civil or political rights because of color, but would merely go to the elimination of the declaration thereof. On a larger, nationwide scale, it would mean that rescission, for example, of the Bill of Rights by some kind of nationwide referendum would not mean rescission of the rights themselves, but only the statement thereof in the Bill of Rights. All of this is completely unrealistic. Much more to the point was the reply of plaintiffs' counsel to this question from the bench:

> "THE COURT: Of course, his [opposing counsel's] answer to that is that the repeal of this Fair Housing ordi-

nance is merely a repeal. It doesn't urge anybody to do anything.

MR. BOWMAN: It gives people the impression that they have a private right to discriminate. Your Honor, this is a rather complex constitutional question here that lawyers would understand that it does not mean that, but most laymen would feel, 'Well, now, I have a perfect right to only sell to the Irish or to the Polish or some other group,' and that the black community would feel, 'I can't buy a house now because of this repeal.'

This is the horrible effect we are trying to avoid."

Also, as we noted heretofore, it is argued that the result of the referendum may be approval of the ordinance, not rejection, and if so, no harm to the petitioners will have been done. This is an argument completely devoid of reality. The arguments against open housing, at this stage of our statutory enactment and constitutional interpretation, can only be arguments against what is now settled as state [5] and national policy [6] grounded upon constitutional guarantees, the disregard of which has done much to foment our present problems. In summary, the arguments against open housing are no longer valid arguments. Their appeal is to a proscribed result, offensive to the equality of all our people. Their mere formulation and broadcast, embracing, as they do, the assumption that rights guaranteed by the Federal Constitution still remain debatable in this community, cannot avoid having a detrimental effect upon the attempted exercise of constitutional rights. The day for such appeals is now past and continued insistence upon them, rather than whole-hearted acquiescence in principles of equality, of tolerance, and of understanding can serve no useful purpose.

Finally, it was suggested on oral argument, although not briefed by defendants, that the referendary repeal might be justified as aimed only at the enforcement provisions of the Fair Housing Ordinance. If this is in truth the real objective of the repeal sought, its protagonists have gone about it in an inexplicably roundabout way and more significantly, indeed fatally, have so intertwined it with unconstitutional considerations that none is a permissible topic for vote.

In short, construed as an attempt merely to restore *status quo*, a vote on the referendum is an exercise in futility. Construed as affirmative encouragement of private discrimination it is unconstitutional. Even construed as nothing more than a poll, it is repugnant and offensive to our people whose constitutional rights are neither to be the subject of popular vote nor to deprivation by popular vote. The will of the electorate does not comprehend the will to curtail or amend constitutional rights, save in constitutional convention or amendment tendered for such purpose. Reitman v. Mulkey, supra, Douglas, J., concurring. There being nothing useful to be gained from further debate in the community upon this issue, it being settled by the cases interpretive of the applicable constitutional provisions, together with legislation (both state and federal) in implementation thereof, we do not place decision upon, nor do we reach, the issue of what is conceded to be the "substantial" exacerbation of public and private emotions which would arise out of the campaigning for the repeal of, as well as the retention of, the Fair Housing Ordinance. Suffice that the issue is no longer one for a public vote.

The permanent injunction against placing the referendum on the petition may issue. A suitable order may be presented.

5. Act 112, P.A. of 1968 (approved by Governor June 11, 1968).

6. Fair Housing Title (Title VIII) Civil Rights Act of 1968, Pub.L. 90–284, 82 Stat. 73.