# HOUSING AND REDEVELOPMENT AUTHORITY OF MINNEAPOLIS AND OTHERS v. CITY OF MINNEAPOLIS AND OTHERS.
## LEO A. BERNAT AND OTHERS, APPELLANTS.

198 N. W. 2d 531.

May 26, 1972—No. 42872.

*Keith D. Kennedy,* for appellants.

*Fredrikson, Byron, Colborn, Bisbee, Hansen & Perlman, Terence M. Fruth,* and *John L. Powers,* for respondent plaintiffs.

*Keith M. Stidd,* City Attorney, and *George V. Johnson,* Assistant City Attorney, for respondent defendants.

OTIS, JUSTICE.

This is an action brought by two residents of the city of Minneapolis and the Housing and Redevelopment Authority of Minneapolis against the city and members of its council for an injunction to prevent defendants from submitting to the voters a proposed charter amendment or for a declaratory judgment holding the proposed amendment unconstitutional. The trial court enjoined the city from conducting the election. The intervenors, who are proponents of the proposed amendment, appeal.[1] We affirm.

---

[1] The city has assumed a passive role in these proceedings. The real adversaries have been the Housing Authority and the intervenors. Although the city was permitted to argue on appeal, it filed no brief in this court.

On March 19, 1970, a petition, signed by more than 15,000 Minneapolis residents obtained largely through intervenors' efforts, presented the proposed amendment to the Minneapolis City Council. Pursuant to Minn. Const. art. 11, § 4, and Minn. St. 410.12, subd. 4, it was incumbent upon the city to submit the proposal to qualified voters for approval or disapproval. This suit to prevent the election followed on April 2, 1970. The court granted intervenors leave to appear and answer.

The proposed charter amendment contained four distinct provisions, which are set out in full herewith:

"PETITION

"To: Charter Commission of the City of Minneapolis, Minnesota

"A committee of electors submit the following proposed charter amendment to the Minneapolis City Charter in accordance with Minnesota Statute 410.12 and Minnesota Constitution Article XI, Section 4.

"Committee of Electors

"Elizabeth M. Wood, 2105 Emerson Ave. N.; John A. S. Webster, 2213 Nicollet Ave.; Richard W. LeRoy, 4705 Fremont Ave. S.; Leo A. Bernat, 503 15th Ave. S. E.; Frank S. Preston Jr., 4901 Abbott Ave. S.

"PROPOSED CHARTER AMENDMENT

"That Chapter 4 of the City Charter of the City of Minneapolis be amended by adding thereto a new Section 23 to read as follows:

"CHAPTER 4 —CITY COUNCIL—POWERS—DUTIES, ETC.

"Section 23. *Initiative and Referendum.*

"23(a). Notwithstanding any provisions of the Minneapolis City Charter to the contrary, upon the filing with the City Clerk of petitions signed by more than 5,000 registered voters of the City demanding that a proposed ordinance, described in said petitions, be submitted to the electorate for approval or disapproval, the City Council shall order a special election for that purpose to be held not later than 120 days from the date of the filing of said petitions with the City Clerk. If a general election

is to be held within the said 120 day period, the question may be presented to the electorate at such general election. All petitions circulated with respect to such proposed ordinance shall be uniform in character, shall have attached thereto a summary of the proposed ordinance, and shall have been signed by the petitioners not more than six months prior to the filing of said petitions. If a majority of the voters of the City voting on the question shall vote to approve the proposed ordinance it shall become effective as an ordinance of the City of Minneapolis as though it had been adopted by a two-thirds vote of the City Council after return by the Mayor with objections thereto. Any ordinance so adopted by the electorate may be repealed only by vote of the electorate at a regular or special election in accordance with a resolution adopted by a two-thirds vote of the City Council or in accordance with petitions duly filed as required herein for the adoption of such ordinance.

"23(b). Notwithstanding any provisions of the Minneapolis City Charter to the contrary, upon the filing with the City Clerk of petitions signed by more than 5,000 registered voters of the City demanding that any action, described in said petitions, which has been taken by the City Council within 90 days of the filing of said petitions be submitted to the electorate for approval or disapproval, the City Council shall order a special election for that purpose not later than 120 days from the date of the filing of said petitions with the City Clerk. If a general election is to be held within the said 120 day period, the question may be presented to the electorate at said general election. All petitions circulated with respect to such action shall be uniform in character and shall have attached thereto a summary setting forth the action taken by the City Council. If a majority of the voters of the City voting on the question shall vote to disapprove the action taken by the City Council such action shall be invalid and action of a substantially similar nature shall not again be adopted by the City Council until the expiration of two years from the date of the election at which such action is rejected.

"23(c). Notwithstanding any provisions of the Minneapolis City Charter to the contrary, no State and/or Federally financed Public Redevelopment Project of Urban Renewal, or Neighborhood Development Plan, or Model Cities Plan, or any other State and/or Federally financed urban renewal project shall be initiated, undertaken, and/or constructed until a special election is first held in the specific area to be redeveloped, in accordance with the laws relating to special elections, and a majority of the voters in the specific area to be redeveloped approve the proposed project. This provision shall apply to all such urban renewal projects heretofore proposed or to be proposed in the future.

"23(d). The provisions of Section 23 shall be severable and the invalidity of any one provision shall not affect the validity of the remainder of Section 23."

The trial court found, among other things, that plaintiffs had no adequate remedy at law; that the proposed amendment was vague, ambiguous, and incapable of implementation; and that in areas of urban renewal "non-resident voters including owners of property, owners of industrial plants and businesses, as well as non-resident employees employed in the areas, have substantial interests in whether the area designated by HRA should be renewed. The proposal would deny to these non-resident city voters the right to vote on renewal projects which directly affect them." The court concluded that the cost of a special election would cause irreparable harm to taxpayers. It further held that the proposal was in violation of Minn. Const. art. 11, § 3, art. 1, § 2, art. 4, § 27, and art. 7; and U. S. Const. Amend. XIV. In an accompanying memorandum the court pointed out that in some renewal areas there are only a few family residences but many retail establishments and industrial plants owned and operated by nonresident employers and employees. By the terms of proposed provision 23(c), such persons would not be entitled to vote on whether a proposed renewal project should be undertaken.

As to provision 23(b), the court stated that to require a refer-

endum not only on ordinances but also on "actions" of the city council would create a "chaotic situation," disrupting the routine activities of the council. The court was of the opinion that interested citizens had ample opportunity to air their views before the city council and the planning commission, and that this was the approach the legislature had in mind.[2]

1. Intervenors challenge the standing of the housing authority (hereafter referred to as HRA) because it is not, strictly speaking, a taxpayer and cannot show a threat of "irreparable harm." While it is true that HRA is a tax-exempt branch of government, nevertheless, under Minn. St. 462.575 and 462.585 it is charged a percentage of rentals for the services and facilities furnished its projects by the municipality. There is no dispute but that the holding of a special election would cost the city $42,420. Under these circumstances, we are of the opinion HRA has sufficient standing to bring these proceedings. In any event the standing of the individual plaintiffs is unchallenged.

2. A more difficult question is whether a court of equity is authorized to enjoin an election on what is essentially a legislative matter. Intervenors cite Bardwell v. Parish Council, 216 La. 537, 44 So. 2d 107, 19 A. L. R. 2d 514 (1949). There, the court held that an election on a proposed charter amendment may not be enjoined despite its dubious validity. The action was said to be premature and the threatened injury not irreparable. The court relied on the general rule than an injunction will not issue to prevent the holding of an election. However, the court noted that rule was not without exception, adding (216 La. 545, 44 So. 2d 109, 19 A. L. R. 2d 517):

"* * * If the threatened action of a municipal council is in direct violation of a prohibitory law, equity will enjoin, even though no irreparable injury is shown * * *."

[2] Minn. St. 1969, § 462.465, was amended by L. 1971, c. 745, §§ 9 and 16, by deleting a requirement that low-rent housing projects be approved by the voters of the municipality.

Two Federal cases have commented on the problem, both enjoining open-housing referendums. Otey v. Common Council of City of Milwaukee, 281 F. Supp. 264 (E. D. Wis. 1968); Holmes v. Leadbetter, 294 F. Supp. 991 (E. D. Mich. 1968). In Otey, the court observed (281 F. Supp. 276) that "the principle of judicial non-interference is one of prudence, not of power." In response to the objection that the action was premature, the court held that by granting an injunction it afforded a remedy which was more direct and better calculated to avoid complications than would be afforded by waiting to grant relief until after the measure was adopted.[3] In Holmes, the court also acknowledged that "the entry of the Court into any stage of the electoral process is a step to be taken only with the utmost caution." 294 F. Supp. 993. However, sitting as chancellor and weighing the equities, the court was convinced that irreparable harm would result from its failure to act.

Two Minnesota cases support our conclusion that it was proper for the trial court to enjoin the election. State ex rel. Andrews v. Beach, 155 Minn. 33, 191 N. W. 1012 (1923); Winget v. Holm, 187 Minn. 78, 244 N. W. 331 (1932). In Andrews we held that mandamus would lie to require the city of Mankato to submit

---

[3] In Otey v. Common Council of City of Milwaukee, 281 F. Supp. 264, 275 (E. D. Wis. 1968), on the issue of the propriety of the injunction, the court said: "As Justice Douglas stated in concurring with the decision in Reitman v. Mulkey [387 U. S. 369, 387, 87 S. Ct. 1627, 1637, 18 L. ed. 2d 830, 841 (1967)]:

" 'And to those who say that Proposition 14 [an initiated measure held unconstitutional after adoption] represents the will of the people of California, one can only reply:

" ' "Wherever the real power in a Government lies, there is the danger of oppression. In our Government the real power lies in the majority of the Community, and the invasion of private rights is *chiefly* to be apprehended, not from acts of Government contrary to the sense of its constituents, but from acts in which the Government is the mere instrument of the major number of the Constituents. This is a truth of great importance, but not yet sufficiently attended to * * *." 5 Writings of James Madison 272 (Hunt ed. 1904).' "

to the voters a proposed charter amendment and that the trial court should not have denied the writ notwithstanding it entertained doubts as to the validity of the proposals:

"* * * It is not within the province of the governing body of a city or of a court to pass judgment on the quality of the work done by a board of freeholders. * * * Neither the city council nor the courts have any supervisory or veto powers." 155 Minn. 35, 191 N. W. 1012.

However, we noted that there was no claim the proposals contravened public policy or statutory or constitutional requirements. We added:

"* * * We do not hold that an amendment to a charter must be submitted even though it is manifestly unconstitutional." 155 Minn. 35, 191 N. W. 1013.

In Winget, we held that it was proper to enjoin an election on a proposed constitutional amendment which was not in proper form "to save the trouble and expense" of voting on a measure which, if adopted, the courts would be compelled to set aside.

We agree that the question of whether a court should enjoin an election is one of judicial propriety and not one of jurisdiction. In the case before us, we are of the opinion that the proposed amendment is manifestly unconstitutional. It was therefore proper for the trial court to enjoin the election rather than permit the administration and the voters of the city of Minneapolis to experience the frustration and expense of setting up election machinery and going to the polls in a process which was ultimately destined to be futile.

3. Addressing ourselves to the proposed charter amendment, no claim is made that provision 23(a) is not proper. It merely implements a right conferred by Minn. Const. art. 11 and by Minn. St. 410.20. If 23(a) is severable, there appears to be no reason why it is not proper for adoption.

4. Turning to provision 23(b), the proposal would confer the right of referendum with respect to "any action" taken by the

city council, not limited to the adoption of ordinances. This broad referendum right not only appears to be without statutory authority under Minn. St. 410.20 but, as the trial court suggests, might well create "a chaotic situation" in city government. Some types of "action" taken by the city without the adoption of an ordinance are the settlement of lawsuits, entering of contracts, acceptance or rejection of bids, sale of municipal bonds, appointment of city officials, levying of taxes, granting of licenses and permits, and the adoption of budgets. By the terms of Minn. Const. art. 11, § 3, home rule charters may be adopted "in accordance with this constitution and the laws." We are satisfied that the restrictions in Minn. St. 410.20 express a legislative intent to limit referendum to ordinances, without granting the sweeping authority which 23(b) purports to confer. Accordingly, we affirm the trial court's holding that 23(b) is invalid.

5. Under provision 23(c), no urban renewal project "heretofore proposed or to be proposed in the future" may be initiated or undertaken without approval by a majority vote of residents in the area to be redeveloped. We concur in the trial court's view that 23(c) is fatally defective in two respects: First, it purports to require approval after the fact in terms which render it unconstitutionally vague. Second, an equally serious deficiency is the provision which confines participation in the referendum to residents of the immediate area affected.

As we read the decisions of the United States Supreme Court dealing with related referendum problems, their import is summarized in Kramer v. Union Free School Dist. No. 15, 395 U. S. 621, 89 S. Ct. 1886, 23 L. ed. 2d 583 (1969). There, a New York statute was struck down which limited voting on school district matters to an owner or lessee of taxable real property, the spouse of such person, or the parent of an enrolled child. The court stated (395 U. S. 626, 89 S. Ct. 1889, 23 L. ed. 2d 589):

"* * * Statutes granting the franchise to residents on a selective basis always pose the danger of denying some citizens any effective voice in the governmental affairs which substantially

affect their lives. Therefore, if a challenged state statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest."

The court went on to recognize that in some situations the state might limit the franchise to those "primarily interested" or "primarily affected," but concluded that in the case before it the statute did not "meet the exacting standard of precision we require of statutes which selectively distribute the franchise."

A similar result was reached in Cipriano v. City of Houma, 395 U. S. 701, 89 S. Ct. 1897, 23 L. ed. 2d 647 (1969). The statute the court was dealing with in Cipriano limited authority to issue utility bonds by requiring approval of a "majority in number and amount of the property taxpayers qualified to vote" at the bond election in the city of Houma. Citing Kramer, the court said whether the statute denies equal protection to otherwise qualified voters depends on whether all those excluded were in fact substantially less interested or affected than those the statute included. Because property owners and nonproperty owners alike were concerned with the utility system and all of them paid taxes either directly or indirectly, the court held that the statute was invalid. The same reasoning was applied in holding a similar statute unconstitutional in City of Phoenix v. Kolodziejski, 399 U. S. 204, 90 S. Ct. 1990, 26 L. ed. 2d 523 (1970).

Although none of the cited cases of the United States Supreme Court is precisely in point, they articulate guidelines which we believe govern our decision. Under them, we are prompted to hold that under provision 23(c) voters in the city of Minneapolis who do not reside within proposed renewal areas would be denied an effective voice in governmental decisions which substantially affect them. We have determined that their exclusion from the franchise in renewal matters is not necessary to promote a compelling municipal interest. We reach this conclusion because of the obvious concern which the whole municipality has in attain-

ing the objectives set forth by statute in § 462.415. Therein, the legislature has found—

"* * * the public interest requires the clearance, replanning, reconstruction, and neighborhood rehabilitation of such substandard and unsanitary areas, and the provision of decent, safe, and sanitary housing for persons of low income and their families; that such redevelopment and the provision of such housing for persons of low income and their families are essential to protect the sources of public revenues; that, in order to protect the financial stability of communities, it is necessary to redevelop substandard and blighted areas according to a comprehensive community plan for development and by encouraging the production of housing properly planned and related to public facilities * * *."

It is not enough, as the intervenors argue, that all of the voters in the city of Minneapolis have an equal opportunity to approve or disapprove the amendment which limits their own franchise in future renewal matters. Experience has demonstrated that far less than a majority of qualified electors participate in special elections of this kind. They should not be permitted to foreclose the majority from participating in future elections. More important, in many renewal areas there are business establishments and industries whose owners and employees far outnumber those who actually reside in the area. To be sure, there was no evidence of how many in these categories were actually qualified to vote in the city of Minneapolis. Nevertheless, it is clear that a great many residents of the city of Minneapolis who own property in renewal areas or whose livelihood results from working in renewal areas would have no voice in future planning if provision 23(c) were adopted. But whether or not they work or own property there, all of the citizens of the city have a substantial interest in the health, safety, morals, and welfare of those who live within its municipal boundaries. These concerns are too obvious to require elaboration. Suffice it to say that it is now too

late to debate the efficacy of State and Federally sponsored renewal projects as a means of preventing and eliminating urban blight. We therefore agree with the trial court's finding that 23(c) would deny to citizens of Minneapolis the equal protection of the laws in violation of the Fourteenth Amendment of the United States Constitution.

6. There remains the question of whether provision 23(a) is severable from provisions 23(b) and 23(c) for purposes of submitting 23(a) separately to the voters for approval.

The language of provision 23(d) is as follows:

"The provisions of Section 23 shall be severable and the invalidity of any one provision shall not affect the validity of the remainder of Section 23."

We accept the reasoning of plaintiffs and the city that the severability provisions of the proposed amendment apply only to challenges to the validity of § 23 which occur after the adoption of the amendment. In other words, if the entire proposal were adopted and subsequently 23(b) and 23(c) were found invalid, by the terms of 23(d), 23(a) would remain unaffected. However, we agree that provision 23(d) does not save the proposed amendment for purposes of submitting it to the voters. We cannot search the minds of those who signed the petition to ascertain their intent. In the absence of such prescience, we feel compelled to hold that the proposal which would be submitted to the voters is not the one which the petitioners sought to have adopted. We recognize that 23(a) is the least controversial of the provisions of § 23. Nevertheless, as a matter of judicial policy, we think the better rule is to prevent an election directed only at a proposal which has been substantially emasculated. Consequently, we have determined that without provisions 23(b) and 23(c), provision 23(a) is not saved by provision 23(d) and the entire proposal must therefore fail.

Affirmed.

PETERSON, JUSTICE (dissenting).

The trial court, upon application of a subordinate agency of government,[1] has enjoined the parent municipality and its electorate from voting upon a proposed charter amendment which, if adopted, would not be wholly invalid. No authority cited in the majority opinion supports, much less compels, this extraordinary judicial intervention. I would remand to the trial court with directions to dissolve the injunction.

The proposed charter amendment has been duly initiated by petition of more than 15,000 citizens and, if adopted, would without doubt be at least partially effective. The validity of provision 23(a) of the proposed charter amendment is unchallenged. This provision is not useless as a matter of law. It effectively implements a state statute, and we should not indulge the assumption that the electorate would reject the proposed amendment if that were the only valid provision.

Provisions 23(b) and 23(c) of the proposed amendment, to be sure, are vulnerable to constitutional challenge by persons having standing to assert the challenge. The constitutional infirmity of 23(b), however, is only that it conflicts with governing statute to the extent that it would permit a referendum on council "actions" other than ordinances, a defect which may be corrected by judicial construction limiting its application to ordinances. A more fundamental objection may well exist as to the voting limitations stated in 23(c), but I would not at this time or on this record accord plaintiffs standing to assert the objection.

KELLY, JUSTICE (dissenting).

I dissent from the majority for a number of specific reasons. Because I believe that at least part of § 23 is a valid proposal, no irreparable injury is caused by permitting the entire proposal

---

[1] Housing and Redevelopment Authority of Minneapolis (HRA) is the principal plaintiff. Charles L. Horn and Leonard W. Anderson, who are chairman and vice-chairman, respectively, of HRA, are additional plaintiffs in the posture of taxpayers.

to be judged first by the people. I would reverse the lower court and dissolve the injunction.

1. A serious question arises in my mind concerning the standing of HRA to bring this suit. HRA is not a taxpayer. According to Minn. St. 462.575, it must pay a percentage of its rent revenues to the city for various services and facilities. If a small suburb were to purchase police and fire protection from its large neighboring city, could it be said that the purchase of such services makes the suburb a "taxpayer"? HRA is a creation of the state and has no business wearing the cloak of a taxpayer.

HRA certainly has no standing in this case other than that based on the questionable claim that it is a taxpayer. To attack proposed or enacted legislation, a party must demonstrate that the legislation affects his personal rights in an unlawful manner. It is not sufficient that he suffers in some indefinite way in common with people generally.[1] As to provisions 23(a) and 23(b), HRA has no possible claim to standing. As to provision 23(c), HRA has not sustained nor is it in immediate danger of sustaining some direct injury from enforcement of this provision. Thus, in Lott v. Davidson, 261 Minn. 130, 143, 109 N. W. 2d 336, 345 (1961), Mr. Justice Murphy stated:

"* * * It is sufficient to say that it is an elementary doctrine of constitutional law that one who invokes the power of the court to declare a statute to be unconstitutional must be able to show not only that the statue is invalid but that he has sustained or is in immediate danger of sustaining some direct injury resulting from its enforcement and not merely that he suffers in some indefinite way in common with people generally."

While the individual plaintiffs as residents, voters, and taxpayers might have standing at some future time in the event the amendments are adopted and they sustain or are in immediate

[1] Minnesota Assn. of Public Schools v. Hanson, 287 Minn. 415, 178 N. W. 2d 846 (1970); Lott v. Davidson, 261 Minn. 130, 109 N. W. 2d 336 (1961).

danger of sustaining injury because of some action taken under the authority thereof, they do not at this time have any right to attack their constitutionality.

2. The majority indicates that the matter of enjoining municipal elections "is one of judicial propriety" and infers that such power should be used only when a proposal is "manifestly unconstitutional." This doctrine of restraint is abandoned when the majority strikes provision 23(b) in its entirety because it exceeds statutory authority and might create "chaotic" situations in city government. It is, of course, entirely possible that 23(b), which would give 5,000 citizens the power to call for a vote of the electorate on "any action" of the city, exceeds the home rule provisions of Minn. St. 410.20. I would prefer, however, to make that determination when the facts of a specific case are before the court. I am adverse to invalidating legislation (or in this case a charter amendment), proposed or enacted, which is in part within the authority of the policy makers. If a case arises which demonstrates the overbreadth of the proposal, it should be declared invalid only as it applies to the facts involved in that litigation if it may be valid as to other fact situations.[2]

While some legislation might be declared invalid for overbreadth because of "chilling effect" or for other compelling reasons, no such effect or reasons are apparent as to 23(b). Invalidating legislation or a proposed charter amendment because it exceeds the authority of the legislators or voters cannot help but create friction between the judiciary and the legislative body or voters. The act of a court in thwarting the will of the policy makers of the government is pretentious at best and should be exercised in an exact and restrained fashion. The act of denying more than 15,000 people the right to merely propose a law to their fellow citizens is a serious matter.

A second reason for judicial restraint is that any other course

[2] See, generally, Note, *The First Amendment Overbreadth Doctrine,* 83 Harv. L. Rev. 844; 16 Am. Jur. 2d, Constitutional Law, §§ 147, 194.

may lead the court into matters uncharted by the experience of the parties before them. To judge statutes and proposals in terms of hypothetical applications is to risk decisions founded on conjecture and uninformed by a record, briefs, and argument which shed light upon the practical application of the proposal.

When a law appears to exceed constitutional or statutory authority, a reviewing court should adopt a restrictive construction which will save the enactment. If provision 23(b) were properly before us, the court could hold that, as applied to an ordinance, the provision is valid. This restrictive construction would be preferable to striking the proposal in toto. As this court stated in City of St. Paul v. Dalsin, 245 Minn. 325, 330, 71 N. W. 2d 855, 859 (1955):

"* * * A legislative act may be unconstitutional and void in its application to some persons or separable subject matters and constitutional as to others." [3]

3. The withdrawal of provision 23(a) from public consideration is even more characteristic of impropriety. No one suggests any shortcoming of 23(a), which allows proposals accompanied by 5,000 signatures to be voted upon by the general electorate. The question before the court is whether the petitioners would seek to have 23(a) alone be submitted to the public. The majority states that "[w]e cannot search the minds of those who signed the petition to ascertain their intent." Yet, provision 23(d) clearly states:

"The provisions of Section 23 shall be severable and the invalidity of any one provision shall not affect the validity of the remainder of Section 23."

To me, the intent of the 15,000 people who signed the petition for submission of the proposed amendment containing 23(d) is that provisions (a), (b), and (c) are separate and independent. The petitioners would rather that all of § 23 become law. That

---

[3] See, also, State ex rel. Young v. Standard Oil Co. 111 Minn. 85, 126 N. W. 527 (1910); 16 Am. Jur. 2d, Constitutional Law, § 194, note 16.

failing, provision 23(d) demonstrates that the enactment of any one provision is to be preferred to none at all.

Provision 23(a) is not "emasculated" by the absence of either or both (b) and (c). The object of 23(a) is to permit a proposal signed by 5,000 people to go before the voters in an election. Minn. St. 410.20 expressly provides that a city may adopt such a procedure, commonly referred to as initiative. Why it should be struck down because of the removal of certain related measures is difficult to understand. While the three provisions may have been part of a certain goal, the severability clause of 23(d) demonstrates a specific intent which should not be ignored.

Since the lower court should not have enjoined the city from presenting provisions 23(a) and 23(b) to the public, no irreparable injury is caused by the presentation of provision 23(c). I would dissolve the injunction.

MR. JUSTICE MACLAUGHLIN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.